UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHON MAGRUDER, *Plaintiff*, v. CAPITAL ONE, NAT'L ASS'N, *et al.*, *Defendants*. | Civil Action No. 19-57 (RDM) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephon Magruder brought suit under the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-202(8), and the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, alleging that various credit reporting agencies misrepresented information about him on his credit reports; that several banks erroneously provided those agencies with the misstated information; and that one debt collector wrongly pursued him to recover debts stemming from the agencies' and banks' errors. *See generally* Dkt. 29 (Am. Compl.). Since filing suit, Plaintiff has stipulated to dismissal of some, but not all, of the Defendants. This Court subsequently ordered Magruder "to show cause why this case should not be dismissed as to [the remaining] defendant[s] for lack of Article III standing." Minute Order (Sept. 13, 2019). For the reasons explained below, the Court concludes that Plaintiff has standing.

### I. BACKGROUND

For purposes of assessing Magruder's standing at this early stage of the litigation, the Court must take the allegations of the complaint as true and must consider the "undisputed facts

evidenced in the record" as they relate to Magruder's standing. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). The Court, accordingly, premises its decision on the following allegations and undisputed facts.

In May 2017, Magruder obtained his credit reports from the three major credit reporting agencies: Equifax, Experian, and Trans Union. Dkt. 29 at 2 (Am. Compl. ¶ 11). Upon review, Magruder determined that the reports contained several inaccuracies:

- For his tradeline (*i.e.*, credit account) with the Navy Federal Credit Union, the reports overstated Magruder's past due amount and charge-off amount, "misrepresented the credit utilization rate by failing to distinguish between purchases and fees," and "reported [the tradeline] in a manner where it appear[ed] that Magruder made purchases in excess of his credit limit." *Id.* at 3 (Am. Compl. ¶¶ 13–15).

- For his tradeline with Capital One, the reports overstated his outstanding balance, failed to note that his account was charged off, and "misrepresented the credit utilization rate by failing to distinguish between purchases and fees." *Id.* at 4 (Am. Compl. ¶ 19).

- For his tradeline with First Premier Bank, the reports overstated his outstanding balance, failed to note that his account was charged off, "misrepresented the credit utilization rate by failing to distinguish between purchases and fees," and listed Magruder as having two accounts with First Premier when he only had one. *Id.* at 4–5 (Am. Compl. ¶ 22).

- For his tradeline with Credit One, the reports overstated his outstanding balance, failed to note that his account had been paid, "misrepresented the credit utilization rate by failing to distinguish between purchases and fees," and, with regards to Equifax and Trans Union's reports specifically, "completely failed to report any information regarding Plaintiff's payment of [his] debt" to Credit One. *Id.* at 5–6 (Am. Compl. ¶ 26–27).

After discovering these inaccuracies, Magruder sent each reporting agency a dispute letter identifying the purported errors and requesting that the agency correct the errors. *See id.* at 3 (Am. Compl. ¶ 16) (letter regarding Navy Federal Credit Union tradeline); *id.* at 4 (Am. Compl. ¶ 20) (letter regarding Capital One tradeline); *id.* at 5 (Am. Compl. ¶ 23) (letter regarding First Premier Bank tradeline); *id.* at 6 (Am. Compl. ¶ 28) (letter regarding Credit One tradeline).

2

But instead of investigating Magruder's complaints, Equifax and Trans Union merely forwarded Magruder's dispute letters to the various banks with whom Magruder held his accounts. *See id.* at 3 (Am. Compl. ¶ 17); *id.* at 4 (Am. Compl. ¶ 21); *id.* at 5 (Am. Compl. ¶ 24); *id.* at 7 (Am. Compl. ¶ 33). Two of those banks—Navy Federal and First Premier—allegedly investigated Magruder's disputes in a "quick[,] sloppy[,] and superficial" manner that failed to verify whether the information reported on Magruder's credit reports was accurate. *Id.* at 4 (Am. Compl. ¶ 18); *id.* at 5 (Am. Compl. ¶ 25). Another bank—Credit One—meanwhile "admitted that it could not verify any of the information being reported" because it had transferred Magruder's account to LVNV Funding ("LVNV"), *id.* at 6 (Am. Compl. ¶ 28), "one of the largest national debt collectors in the United States," *id.* at 2 (Am. Compl. ¶ 10). LVNV, after conducting a "quick, sloppy[,] and superficial" investigation into Magruder's dispute, concluded that it too "could not verify" Magruder's debt. *Id.* at 6 (Am. Compl. ¶¶ 29–30). Instead, it "referred [Magruder] from place to place" until finally directing him to contact a debt-collection law firm named Stillman. *Id.* (Am. Compl. ¶ 29). Magruder called Stillman, who informed him that it was likewise "unable to validate [his] debt." *Id.* (Am. Compl. ¶ 29). Nevertheless, Stillman said, "a lawsuit had been filed and a judg[]ment obtained against" Magruder for that debt. *Id.* (Am. Compl. ¶ 29). Magruder asked Stillman for "proof that the lawsuit was served on him." *Id.* (Am. Compl. ¶ 31). None came. *Id.* at 6–7 (Am. Compl. ¶ 31).

At this point, nearly one-and-a-half years had passed since Magruder first discovered his credit reports' inaccuracies. *Compare id.* at 2 (Am. Compl. ¶ 11) *with id.* at 7 (Am. Compl. ¶ 32). Yet after contacting the credit reporting agencies, the banks, the debt collector, and the debt-collection law firm, Magruder was no closer to resolving his dispute. In a last effort, Magruder sent yet another letter to Equifax, Experian, and Trans Union asking for their help. *Id.*

3

at 7 (Am. Compl. ¶ 32). Trans Union responded by falsely claiming that its report was accurate; Experian "disingenuously claimed it could not process the dispute;" and Equifax neglected to respond at all. *Id.* (Am. Compl. ¶ 33).

Three weeks later, Magruder brought this suit. *See* Dkt. 1–2 at 2. His initial complaint, filed in the Superior Court of the District of Columbia, alleged: (1) in Count One, that LVNV violated § 1692e(2), (8), and (10) and § 1692f of the FDCPA by "falsely representing that a debt was owed," "falsely representing that a judgment had been obtained," and "communicating information that it knew was false to the [credit reporting agencies]," *id.* at 7–8; (2) in Count Two, that LVNV violated § 14-202(8) of the MCDCA "by claiming that it had obtained judgment against" Magruder, *id.* at 8; (3) in Count Three, that Navy Federal, Capital One, First Premier Bank, Credit One, and LVNV violated § 1681s-2(b)(1)(A)–(E) of the FCRA by failing adequately to investigate and remedy Magruder's disputes, and that Navy Federal, Credit One, and LVNV violated § 1681s-2(b)(1)(C)–(E) of the FCRA "by failing to report the status of the debt as disputed," *id.* at 8–10; (4) in Count Four, that Equifax, Experian, and Trans Union violated § 1681e(b) of the FCRA "by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of . . . Magruder['s] credit reports and credit files," *id.* at 10–11; and (5) in Count Five, that Equifax and Trans Union violated § 1681i(a) of the FCRA in various ways, most saliently, "by failing to conduct a reasonable investigation" into Magruder's dispute and by failing to modify Magruder's credit reports to remedy their purported inaccuracies, *id.* at 11–12.

On January 10, 2019, Trans Union removed Magruder's suit to this Court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. *See* Dkt. 1 (Notice of Removal). Thereafter, Trans Union, Capital One, Credit One, and LVNV answered the complaint; Equifax and Navy Federal moved

to dismiss; and First Premier Bank moved to stay the action and to compel arbitration. *See* Dkt. 7 (Trans Union answer); Dkt. 18 (Capital One answer); Dkt. 26 (Credit One Answer); Dkt. 27 (LVNV answer); Dkt. 11 (Navy Federal motion to dismiss); Dkt. 21 (Equifax motion to dismiss); Dkt. 25 (First Premier Bank motion to stay and compel arbitration). Magruder responded by filing an amended complaint, and Defendants renewed their answers and motions. *See* Dkt. 29 (Am. Compl.); Dkt. 33 (Trans Union answer); Dkt. 34 (Capital One answer); Dkt. 37 (LVNV answer); Dkt. 38 (Credit One Answer); Dkt. 39 (First Premier Bank motion to stay and compel arbitration). Magruder eventually stipulated to the voluntary dismissal of three defendants (Experian, Navy Federal, and Equifax). *See* Minute Order (May 9, 2019) (dismissing action with prejudice as to Experian); Minute Order (Sept. 30, 2019) (dismissing action with prejudice as to Navy Federal); Minute Order (Feb. 7, 2020) (dismissing action with prejudice as to Equifax).

Before proceeding with the case, the Court sought to "assure[] itself of its own subject matter jurisdiction" and, accordingly, ordered Magruder "to show cause why this case should not be dismissed as to each defendant for lack of Article III standing." Minute Order (Sept. 13, 2019). For the following reasons, the Court concludes that Magruder has Article III standing at this point in the litigation.

## II.  ANALYSIS

Article III of the Constitution limits "[t]he judicial power of the United States" to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 2. "To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). To establish standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547

(2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  A plaintiff must support each of these three elements "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  At the pleading stage, therefore, "general factual allegations of injury resulting from the defendant's conduct may suffice."  *Id.*  But because "standing is not dispensed in gross," *Town of Chester, New York v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), a plaintiff must "demonstrate standing for each claim he seeks to press" against each defendant, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006), and "for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

The question before the Court concerns "injury in fact, the first and foremost of standing's three elements."  *Spokeo*, 136 S. Ct. at 1547 (cleaned up).  A plaintiff sustains an "injury in fact" when he suffers "an invasion of a legally protected interest" that is both (1) "actual or imminent, not conjectural or hypothetical," and (2) "concrete and particularized."  *Id.* at 1548.  An injury is "particularized," the Supreme Court has explained, when it "affect[s] the plaintiff in a personal and individual way."  *Id.*  An injury is "concrete," meanwhile, when it is "real[,] not abstract"—in other words, when it "actually exist[s]."  *Id.*  "'Concrete' is not, however, necessarily synonymous with 'tangible.'"  *Id.* at 1549.  In evaluating "whether an intangible harm constitutes injury in fact," courts must consider "both history and the judgment of Congress."  *Id.*  As to history, "it is instructive to consider whether an alleged intangible harm has [a] close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Id.*  And as to Congress, the Court must consider whether Congress has permissibly sought to "elevate to the status of legally cognizable injuries concrete *de facto* injuries that were previously inadequate in law," *id.* at 1549 (quoting *Lujan*,

6

504 U.S. at 578) (alteration omitted), or, instead, has impermissibly sought to "dispense with the constitutional baseline of a concrete injury in fact," *Hancock v. Urb. Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016).  With these precepts in mind, the Court concludes that Magruder has standing to pursue his claims against the remaining Defendants.

Magruder alleges that he was injured by the remaining Defendants in the following ways. First, in Counts One and Two, he alleges that LVNV's actions "caused [him] to incur economic damages and emotional/mental distress damages, including . . . out-of-pocket expenses, fear, embarrassment, humiliation, frustration, anger, headaches, sleeplessness, severe emotional and mental distress."  Dkt. 29 at 8 (Am. Compl. ¶¶ 37, 42).  Second, in Count Three, he alleges that Defendants Capital One, First Premier, Credit One, and LVNV's violations of the FCRA caused him to suffer "actual damages, including . . . loss of credit, out[-]of[-]pocket expense connected with attempting to correct his reports, damage to credit profile and reputation, embarrassment, humiliation and other mental and emotional distress."  *Id.* at 9 (Am. Compl. ¶ 51).  Finally, in Counts Four and Five, he alleges that Defendant Trans Union's violations of the FCRA caused him to suffer "actual damages, including . . . loss of credit opportunity, damages to reputation, embarrassment, humiliation and other mental and emotional distress."  *Id.* at 10, 12 (Am. Compl. ¶¶ 59, 71).  Magruder's allegations of injury thus take two basic forms—claims of tangible economic loss and of intangible emotional suffering.  *See id.* at 8–10, 12 (Am. Compl. ¶¶ 37, 42, 51, 59, 71).  Each claim, however, has its problems.

The first problem is one of fact:  Magruder's claims of tangible harm—economic damages, loss of credit, and the like—are largely devoid of supporting factual allegations.  The amended complaint does not identify a single expense that Magruder incurred, a single dollar that he lost, or a single credit opportunity that he was denied.  *See id.* at 8–10, 12 (Am. Compl.

¶¶ 37, 42, 51, 59, 71).  It is true, of course, that "[t]he pleading standard . . . does not require detailed factual allegations" to substantiate a claim of injury.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)).  But it is equally true that "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" is required.  *Id.*

The second problem is one of law:  Magruder's remaining allegations focus on emotional injury, yet free-standing "emotional harm, no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes."  *Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (quotation marks omitted).  Instead, "a plaintiff can only establish an Article III injury in fact based on emotional harm if that alleged harm stems from the infringement of some legally protected . . . or judicially cognizable . . interest that is either recognized at common law or specifically recognized as such by the Congress."  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 25 (D.D.C. 2010) (quotation marks omitted).  Recall *Spokeo*: when it comes to intangible injuries, "history and the judgment of Congress" matter.  136 S. Ct. at 1549.

According to Defendants, these issues of fact and law pose insurmountable obstacles to Magruder's standing.  His allegations of tangible injury are too threadbare, and his allegations of emotional injury are unsound as a matter of law.  For the reasons that follow, however, the Court concludes that both obstacles can be overcome—at least for now.

First, the problem of fact.  Magruder's allegations of tangible injury are thin by any measure—he claims to have suffered economic loss, for instance, but neglects to explain how, when, where, or in what degree.  For present purposes, however, that is (barely) enough.  In *Lujan v. Defenders of Wildlife*, 504 U.S. at 561, the Supreme Court explained that "[t]he party invoking federal jurisdiction" must support each of the essential elements of standing "with the manner and degree of evidence required at the successive stages of litigation."  Where, as here,

the question of standing arises "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Arguably, the Supreme Court's intervening decision in *Iqbal* requires more than general factual allegations of injury. 556 U.S. at 678–79. At least with respect to "the elements of the cause of action," *Iqbal* requires more than "mere conclusory statements" and, beyond that, the decision requires that a complaint "state[] a plausible claim for relief." *Id.* at 679. D.C. Circuit precedent post-dating *Iqbal*, however, has continued to invoke *Lujan*'s formulation of the injury-in-fact pleading requirement. In *Frank v. Autovest, LLC*, for example, the court recently observed that the plaintiff "satisfied her burden at the pleading stage by including 'general factual allegations of injury resulting from the defendant's conduct.'" 961 F.3d 1185, 1187 (D.C. Cir. 2020) (quoting *Lujan*, 504 U.S. at 561).[1] Thus, in that Fair Debt Collection Practices Act case, it was sufficient for the plaintiff to allege "that she was deceived by the Defendants' false, deceptive and misleading representations; that she suffered agitation, annoyance, emotional distress, and undue inconvenience; and that she 'incurred actual damages including

---

[1] Although *Autovest*'s invocation of *Lujan*'s injury-in-fact formulation was arguably dicta—the case was before the court at the summary judgment, not motion to dismiss, stage—other D.C. Circuit decisions postdating *Iqbal* have made the same point. *See, e.g.*, *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 60–61 (D.C. Cir. 2019) ("The Supreme Court has explained that '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Lujan*, 504 U.S. at 561)); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015) (same); *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (same); *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625–26 (D.C. Cir. 2017) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" (quoting *Lujan*, 504 U.S. at 561)); *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (same); *Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1116 (D.C. Cir. 2017) (same).

. . . attorney's fees and costs." *Id.* (internal quotation marks and citation omitted). She failed to carry her burden on summary judgment, however, because she "fail[ed] to identify a concrete personal injury traceable to the false representations" allegedly made by two agents of the debt holder and the debt holder's counsel in affidavits they filed in Superior Court, *id.* at 1187, and, indeed, failed to testify that she was "confused, misled, or harmed in any relevant way during the collection action by the contested affidavits," *id.* at 1188. Moreover, "although [the plaintiff] stated that [the debt holder's] suit caused her stress and inconvenience, . . . she never connected those harms to the [allegedly false] affidavits." *Id.*

Here, the Court is persuaded that Magruder has "cleared the low bar to establishing . . . standing at the pleading stage." *In re U.S. Office of Personnel Mgt. Data Security Breach Lit.*, 928 F.3d at 61 (quoting *Attias*, 865 F.3d at 622). He alleges that he incurred tangible, "out-of-pocket expenses" as a result of LVNV's violation of the FDCPA, *see* Dkt. 29 at 7–8 (Am. Compl. ¶¶ 36–38), and the MCDCA, *see id.* at 8 (Am. Compl. ¶¶ 40–43), and as a result of Capital One, First Premier, Credit One, and LVNV's violations of the FCRA, *see id.* at 8–10 (Am. Compl. ¶¶ 45–54). Magruder, however, fails to allege any tangible injury resulting from Trans Union's alleged violation of the FCRA; in Counts Four and Five, he merely alleges that he "suffered actual damages, including . . . loss of credit opportunity, embarrassment, humiliation and other mental and emotional distress." *See id.* at 10–12 (Am. Compl. ¶¶ 56–61, 63–73). If Magruder intends to allege that he has suffered or will imminently suffer some tangible loss—as opposed to a mental or emotional injury of some sort—resulting from a lower credit rating, he needs to say more.

Magruder's failure to allege that he has sustained a tangible injury as a result of Trans Union's alleged violation of the FCRA, however, does not doom his claim at this early stage of

10

the proceeding because he does allege an emotional harm, which suffices for purposes of the FCRA (and the FDCPA).  In assessing whether an emotional harm can satisfy the Article III injury-in-fact requirement, the Court must, as explained above, consider both "history and the judgment of Congress."[2]  *Spokeo*, 136 S. Ct. at 1549.  Both considerations weigh in favor of the conclusion that Magruder has alleged enough to satisfy Article III.

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting . . . and [to] protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  In doing so, "Congress plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk." *Spokeo*, 136 S. Ct. at 1550.  As explained in the Act's legislative history, "[t]he purpose of the fair credit reporting bill is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91–517 at 1 (1969).  In other words, the "FCRA . . . was crafted to protect

---

[2]  Neither *Spokeo* nor D.C. Circuit precedent clarify what role *state* legislatures (as opposed to the U.S. Congress) play in determining whether an intangible harm constitutes injury in fact. That matters because Count Two of Magruder's complaint alleges a violation the MCDCA—a state, not federal, law.  However, because the Court has concluded that Magruder's allegations of tangible harm in Count Two suffice—at least for now—the Court need not consider whether Magruder's allegations of emotional harm in Count Two also suffice.  With that said, the Court notes that several other courts *have* concluded that "[s]tate [l]egislature[s] ha[ve] the power to create legal interests [the] violation [of which] can satisfy Article III." *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, No. 19-1774, 2021 WL 1846308, at *4 (2d Cir. May 10, 2021); *see also Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 621 (7th Cir. 2020) (subsequent history omitted); *Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 (3d Cir. 2017); *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008); *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001).  That position appears to be consistent with Supreme Court caselaw as well, although the Court has yet to rule on the issue.  *See Diamond v. Charles*, 476 U.S. 54, 66 n.17 (1986) (remarking in dicta that "[t]he Illinois Legislature . . . has the power to create new interests, the invasion of which may confer standing"); *cf. Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 279 (2008) (holding that an assignee of a legal claim for money retained standing to sue in federal court when that assignee had promised to give all litigation proceeds back to the assignor because "most state courts entertained suits virtually identical to" the suit before the Court throughout the nineteenth century).

consumers from the transmission of inaccurate information about them . . . and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *see also St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989) (same); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir. 1984) ("[I]n introducing the fair credit reporting bill, Senator Proxmire said: '[p]erhaps the most serious problem in the credit reporting industry is the problem of inaccurate or misleading information.'" (cleaned up) (quoting 115 Cong. Rec. 2411 (1969))).

Intangible injuries that result from inaccurate credit reporting fit neatly within the types of harms that Congress sought to abate. As the Ninth Circuit summarized on remand in *Spokeo*:

> [G]iven the ubiquity and importance of consumer reports in modern life—in employment decisions, in loan applications, in home purchases, and much more—the real-world implications of material inaccuracies in those reports seem patent on their face. Indeed, the legislative record includes pages of discussion of how such inaccuracies may harm consumers in light of the increasing importance of consumer reporting nearly fifty years ago. . . . In this context, it makes sense that Congress might choose to protect against such harms without requiring any additional showing of injury. The threat to a consumer's livelihood is caused by the very existence of inaccurate information in his credit report and the likelihood that such information will be important to one of the many entities who make use of such reports. Congress could have seen fit to guard against that threat (and, for example, against *the uncertainty and stress it could cause to the consumer's life*), especially in light of the difficulty the consumer might have in learning exactly who has accessed (or who will access) his credit report.

*Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017) (emphasis added); *see also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 640 (3d Cir. 2017) (plaintiffs had standing to sue under FCRA when laptops containing their personal information were stolen from defendants, as this "unauthorized dissemination of their own private information—the very injury that FCRA is intended to prevent" constituted "a de facto injury that satisfies the

concreteness requirement" regardless of "whether or not the disclosure of that information increased the risk of identity theft or some other future harm"); *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 632 (E.D. Va. 2016) ("Congress sought 'to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information,' and 'to *prevent an undue invasion of the individual's right of privacy* in the collection and dissemination of credit information.'" (quoting S. Rep. No. 91–517 at 1).

Magruder's allegations of harm fall within the scope of injuries that courts have found to be cognizable under the FCRA, even if intangible. Magruder alleges, for example, that his credit reports were materially misleading because they stated that he had outstanding debts on four separate tradelines when, in reality, he had no such debts. Dkt. 29, at 3–5 (Am. Compl. ¶¶ 11–13, 19, 22, 26–27). That misinformation, Magruder further alleges, was repeatedly disseminated to third parties without Magruder's permission. *Id.* at 7 (Am. Compl. ¶ 34) ("Equifax, Experian and Trans Union have each prepared and published to third parties' multiple inaccurate consumer reports about [Magruder] that contained the inaccurate derogatory debts from Capital One, Navy Federal, First Premier, Credit One and LVNV."). And Magruder claims he suffered emotional harm as a result of those allegedly unlawful publications. *Id.* at 8–10, 12 (Am. Compl. ¶¶ 37, 42, 51, 59, 71). The FCRA was enacted to deter just this. *See* S. Rep. No. 91–517 at 1; *Spokeo*, 136 S. Ct. at 1550; *Safeco*, 551 U.S. at 52; *Spokeo*, 867 F.3d at 1114 *Guimond*, 45 F.3d at 1333; *Johnson*, 884 F.2d at 883; *In re Horizon Healthcare*, 846 F.3d at 640; *Koropoulos*, 734 F.2d at 40. Congress's judgment, therefore, suggests that Magruder's allegations of intangible harm qualify as a legally cognizable injury in this context. *Spokeo*, 136 S. Ct. at 1549.

History confirms that conclusion. "As other courts have observed, the interests that FCRA protects also resemble other reputational and privacy interests that have long been

protected in the law." *Spokeo*, 867 F.3d at 1114. For example, there is "a significant history, including at common law, of lawsuits based on (1) the unauthorized disclosure of a person's private information, and (2) the disclosure of adverse information claimed to have been misleading or false." *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 522 (S.D.N.Y. 2017); *see also Thomas*, 193 F. Supp. 3d at 636 ("[I]t has long been the case that an unauthorized dissemination of one's personal information, even without a showing of actual damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue.") (citing Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890)). Most significantly, "the common law provided for per se liability—without proof of special harm—for slanderous statements that would adversely affect one's" employment or commercial interests. *Gambles*, 234 F. Supp. 3d at 522 (citing Restatement (Second) of Torts § 573 (1977)). Those interests overlap with the type of injuries that can flow from the dissemination of inaccurate or misleading credit reports, which are often relied upon by employers and creditors. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279–80 (11th Cir. 2017) ("The reporting of inaccurate information about [the plaintiff's] credit to a credit monitoring service[] has a close relationship to the harm caused by the publication of defamatory information, which has long provided the basis for a lawsuit in English and American courts."); *In re Horizon Healthcare*, 846 F.3d at 639–40 ("[T]he intangible harm that FCRA seeks to remedy has a close relationship to a harm [i.e. invasion of privacy] that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." (quotation marks omitted)); *Spokeo*, 867 F.3d at 1115 ("Courts have long entertained causes of action to vindicate intangible harms caused by certain untruthful disclosures about individuals, and we respect Congress's judgment that a similar harm would result from inaccurate credit reporting.").

In this case, then, history and legislation point in the same direction: because Magruder's emotional distress was allegedly caused by the "dissemination of false information" about him, *Spokeo*, 136 S. Ct. 1550, and by the presence of "inaccurate or misleading information" about him in his credit reports, *Koropoulos*, 734 F.2d at 40 n.4, that harm, under the FCRA and against the backdrop of common-law privacy torts described above, qualifies as a legally cognizable injury in fact for purposes of Article III. *Spokeo*, 136 S. Ct. 1548–50. Magruder therefore has standing to pursue Counts Three through Five of his complaint. Dkt. 29, at 8–12 (Am. Compl. ¶¶ 44–73).

The same result and a similar analysis apply to Magruder's claim under the FDCPA, a statute that Congress enacted "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). The Senate report explains:

> [D]ebt collection abuse by third party debt collectors is a widespread and serious national problem. Collection abuse takes many forms, including . . . misrepresentation of a consumer's legal rights, . . . impersonating public officials and attorneys, and simulating legal process. . . . While unscrupulous debt collectors comprise only a small segment of the industry, the suffering and anguish which they regularly inflict is substantial.

S. Rep. 95-382, at 2 (1977). A House Report similarly observes that at the time of the FDCPA's passage, "there ha[d] been an increasing incidence of debt collectors abusing consumers by using various means of harassment and deception," including by sending "phony legal documents." H. Rep. No. 95-131, at 2 (1977). And as the statutory text explains, prior to the FDCPA, there was "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors," which, in turn, "contribute[d] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692a(a). Congress enacted the FDCPA to put an end to these abuses. *See id.* § 1692f (prohibiting use of "unfair or unconscionable means to collect or attempt to collect any debt");

15

*id.* § 1692e(2)(a) (prohibiting debt collectors from falsely representing the "legal status of any debt"); *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope."); *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (same).

To be sure, an FDCPA plaintiff must do more to establish standing than point to an alleged FDCPA violation; it is not enough, in other words, that Congress sought to curb the challenged practice. *See Autovest*, 961 F.3d at 1188.[3] "[A]n FDCPA plaintiff," nevertheless, "possesses multiple avenues to standing." *Id.* at 1189 (citing *Hagy v. Demers & Adams*, 882 F.3d 616, 621 (6th Cir. 2018)). For instance, in *Hagy*, the Sixth Circuit suggested that an FDCPA plaintiff might have Article III standing if the challenged "non-disclosure created a risk of double payment, *caused anxiety*, or led to any other concrete harm." 882 F.3d at 622 (emphasis added). And in *Autovest*, the D.C. Circuit suggested that "stress and inconvenience" might be cognizable harms for purposes of Article III if, in fact, there was a clear causal link between those harms and the purportedly unlawful conduct. 961 F.3d at 1188.

Although a close question, the Court concludes that Magruder's allegations are sufficient—at this early stage of the litigation—to establish standing based on intangible injury.

---

[3] At least two circuits have concluded that "the violation of a procedural right granted by [the FDCPA] is sufficient in and of itself to constitute concrete injury in fact because Congress conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest." *Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 756 (6th Cir. 2018); *see also Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 81 (2d Cir. 2018) ("Congress . . . sought to protect consumers' concrete economic interests in enacting [the FDCPA]."). As discussed, the D.C. Circuit foreclosed this approach in *Autovest*, 961 F.3d at 1189; *see also Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019).

In Count One of his amended complaint, Magruder alleges that LVNV "falsely represent[ed] that a debt was owed," "falsely represent[ed] that a judgment had been obtained" against him to recover on that debt, and improperly communicated information that it knew it was false to the credit reporting agencies." Dkt. 29 at 7 (Am. Compl. ¶ 36).  Magruder also alleges, elsewhere in the amended complaint, that the debt LVNV mistakenly reported led the Stillman law firm to "advise[] [Magruder] that a lawsuit had been filed and a judg[]ment obtained against him" for that debt.  *Id.* at 6 (Am. Compl. ¶ 29).  The attendant mental distress that Magruder allegedly suffered was, on this theory of the case, caused by a series of statutory violations at the heart of Congress's scheme, namely, the prohibition against debt collectors mischaracterizing the "legal status of any debt" and then disseminating false information about that debt, 15 U.S.C. § 1692e(2)(a), all leading to the issuance of "phony legal" process, H. Rep. No. 95-131, at 2 (1977); *see also* S. Rep. 95-382, at 2 ("Collection abuse takes many forms, including . . . misrepresentation of a consumer's legal rights, . . . impersonating public officials and attorneys, and simulating legal process.").

Common-law history supports this conclusion as well.  As the Eighth Circuit has explained:

> [In the FDCPA] Congress identified a harm—being subjected to attempts to collect debts not owed.  This alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.  It is similar to the harm suffered by victims of the common-law torts of malicious prosecution, wrongful use of civil proceedings, and abuse of process. . . .  The harm of being subjected to baseless legal claims, creating the risk of mental distress, provides the basis for both [FDCPA] claims and the common-law unjustifiable-litigation torts.

*Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 691–92 (8th Cir. 2017) (quotation marks omitted).  That analysis has been endorsed by others.  *See, e.g.*, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1009 (11th Cir. 2020) (Martin, J., concurring in part and dissenting in

17

part) (recognizing the "close relationship" between FDCPA claims based on unlawful attempts to collect debts to "abuse of process torts"); *cf. Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 870 (6th Cir. 2020) (suggesting that abuse of process may be an analogous tort where FDCPA liability is premised on a debt collector falsely pursuing litigation against a debtor).

As explained, LVNV is alleged to have "falsely represent[ed] that a judgment had been obtained" against Magruder and, it can be inferred, caused the Stillman law firm to "advise[] [Magruder] that a lawsuit had been filed and a judg[]ment obtained against him" for that debt. Dkt. 29 at 6 (Am. Compl. ¶ 29). Magruder's protestations against LVNV's efforts in that regard have analogs in the "common-law unjustifiable-litigation torts" just discussed. *Demarais*, 869 F.3d at 692. For those reasons, "history and the judgment of Congress" tip in favor of cognizing Magruder's allegations of emotional harm as an injury-in-fact insofar as the FDCPA is concerned. *Spokeo*, 136 S. Ct. 1549.

\*   \*   \*

For now, the problems of fact and law that inhere in Magruder's allegations of injury have been overcome: Magruder's tangible injuries are adequately pled—barely, to be sure—while Magruder's intangible injuries survive *Spokeo*'s demands—at least at the pleading stage. It bears emphasis, however, that Magruder has only barely cleared the standing hurdle at the pleading stage and that establishing standing at summary judgment is considerably more demanding than it is here. To survive a Rule 56 motion, Magruder will have to "set forth by affidavit or other evidence specific facts" to establish, with respect to each defendant pursued in each Count, that he suffered a legally cognizable injury, fairly traceable to that defendant, and redressable by a favorable judicial decision. *Lujan*, 504 U.S. at 561. This requirement applies with equal force to both Magruder's intangible and tangible injuries; "mere allegations" will no

longer suffice. *Id.* At that point in the litigation, Magruder will need to be far more specific about the alleged injuries; he will need to offer proof that he actually sustained (or will soon sustain) those injuries; and he will need to offer evidence that the alleged FDCPA and FCRA violations caused those injuries.

For present purposes, however, it is premature to determine what Magruder will need to show at the next stage of the litigation. Even if some greater showing of emotional injury is indeed required at summary judgment—such as medical evidence or testimony from family members about the harm Magruder suffered, *see, e.g.*, *In re Dawson*, 390 F.3d 1139, 1150 (9th Cir. 2004)—that requirement does not apply when evaluating Magruder's claims at this early juncture. The parties should be aware, however, that the issue looms. *See, e.g.*, *Doe v. Chao*, 540 U.S. 614, 617–18 (2004); *id.* at 641 (Ginsburg, J., joined by Stevens and Breyer, J.J., dissenting) ("Doe has standing to sue, the Court agrees, based on allegations that he was torn all to pieces and greatly concerned and worried because of the disclosure of his Social Security number and its potentially devastating consequences. . . . Standing to sue, but not to succeed, the Court holds[.]" (ellipses, citation, and internal quotation marks omitted)); *Rice v. United States*, 245 F.R.D. 3, 6 (D.D.C. 2007) (plaintiffs demonstrated standing at summary judgment "by submitting [uncontested] declarations . . . in which named plaintiffs claim to have suffered 'anger, dismay, anxiety, and fear about what has occurred and what could happen'"); *but see Beck v. McDonald*, 848 F.3d 262, 272 (4th Cir. 2017) ("We also reject the Plaintiffs' claim that emotional upset and fear [of] identity theft and financial fraud . . . are 'adverse effects' sufficient to confer Article III standing. . . . That assertion reflects a misunderstanding of the Privacy Act and is an overextension of *Doe v. Chao*[.]" (citations and internal quotation marks omitted)); *Autovest*, 961 F.3d at 1188 (finding plaintiff failed to establish standing at summary judgment

where she testified that she experienced "stress and inconvenience" but failed to "connect[]" those harms to the defendants' statutory violations).

## CONCLUSION

For the foregoing reasons, the Court concludes that, at this stage of the proceedings, Magruder has standing to pursue his claims. First Premier Bank may renew its motion to stay and compel arbitration by June 18, 2021.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: May 19, 2021